Erie Bronze Company v. Commissioner.
Erie Bronze Co. v. Commissioner
Docket No. 27200.
United States Tax Court
1951 Tax Ct. Memo LEXIS 304; 10 T.C.M. (CCH) 205; T.C.M. (RIA) 51060; March 8, 1951
*304 Enoch C. Filer, Esq., 1005 Ariel Bldg., Erie, Pa., for the petitioner. George C. Lea, Esq., for the respondent. MURDOCK
Memorandum Findings of Fact and Opinion The commissioner determined a deficiency of $2,427.65 in the income tax of the petitioner for 1946. The only issue for decision is whether the petitioner is entitled to deduct as an ordinary and necessary business expense $19,285.85 paid in 1946 allegedly to compromise threatened litigation. [The Facts] The petitioner filed its corporate income tax return for 1946 with the collector of internal revenue for the twenty-third district of Pennsylvania. It used an accrual method of accounting. B. C. Edkin owned all of the outstanding stock of the petitioner on November 10, 1932. It consisted of 1,000 shares of common stock and 800 shares of preferred stock. Nine hundred fifty shares of the common and all of the preferred shares were pledged by Edkin at the Second National Bank of Erie, Pennsylvania for a loan, the principal amount of which on November 10, 1932 was $40,000. Edkin, at that time, owed the petitioner $38,073.33. The petitioner was not operating profitably. Edkin tried to induce C. E. Piper *305 to become manager of the petitioner in order to improve the operation of the business. Piper agreed upon condition that he could purchase about one-half of the stock. The petitioner, Piper and Edkin entered into a contract on November 10, 1932 providing that Piper would become general manager of the petitioner for a term to be at the discretion of its board of directors. The petitioner agreed to assume and pay the indebtedness of $40,000 owed by Edkin to the Second National Bank; Edkin was to surrender or cancel all of the preferred stock; the petitioner was then to cancel the indebtedness of $38,073.33 owed it by Edkin; Piper was to have immediate voting rights on 49 per cent of the remaining stock and was to pay Edkin $20,000 for that stock within 10 years; and the stock until paid for was to be held in escrow. The written contract of November 10, 1932 was amended on February 3, 1934 by an oral agreement between Edkin and Piper. The Second National Bank was still holding the stock pledged with it, Edkin had not turned in any of the preferred stock for cancellation and Piper had not received any of the common stock. Edkin and Piper orally agreed that, instead of turning in the *306 preferred stock for cancellation, Edkin would retain one-half of it and transfer the other half to Piper and, instead of leaving the 499 shares of common stock in escrow, they would be transferred immediately to Piper. The record does not show what change, if any, was made in regard to the debt of $40,000 due to the bank or to the debt of $38,073.33 owed by Edkin to the petitioner. Four hundred shares of preferred stock and 499 shares of common stock were then placed in the name of Piper and Edkin continued to own the remaining shares. The stock pledged with the bank remained pledged. Piper paid Edkin $20,000 for stock of the petitioner between 1936 and 1940. The petitioner made some payments of interest and a small amount of principal to the bank on the $40,000 indebtedness beginning in 1933. It deducted those payments as expenses. Edkin, in 1936, borrowed $32,974.73 from the petitioner and used it with $7,000 borrowed on his home to pay off the remaining balance due the bank. Edkin then owed the petitioner $72,283.06. The petitioner instituted a bonus plan in 1936 under which bonuses, generally in equal amounts, were paid to Edkin and Piper from 1936 through 1942. A son of *307 Edkin and a son of Piper also received bonuses. Bonuses in the total amount of $111,262.83 were paid. Edkin used his own bonuses, the $20,000 received from Piper for the stock, $4,000 received from Piper as a "Xmas Gift," and $4,000 received from Piper's son, $2,000 of which was called a "Gift," to reduce his indebtedness to the petitioner. That indebtedness amounted to $8,285.85 in November 1945. Edkin sold 400 shares of preferred and 499 shares of common stock of the petitioner to a nominee of the petitioner on November 6, 1945 and the petitioner acquired and held the stock as treasury stock thereafter. The amount paid for the stock was $107,500. Edkin in May 1946 gave to Piper a paper headed as follows: "B. C. EDKIN "vs "ERIE BRONZE COMPANY, a corporation, and C. E. PIPER IN THE COURT OF COMMON PLEAS OF ERIE COUNTY, PENNSYLVANIA
NO. SEPTEMBER TERM, 1946 "PLAINTIFF'S STATEMENT OF CLAIM" No such statement of claim was ever filed in court and no cause of action was actually instituted. The claim was based upon the written agreement of November 10, 1932, but did not refer to any oral modification. Edkin stated in his claim that Piper had not paid him the $20,000 for the *308 499 shares of common stock, and the petitioner had not paid the $40,000 debt at the bank, instead, Edkin had paid the bank, but since Piper claimed to have paid him $36,141.53, claim was made for the difference of $23,858.47. Edkin further stated that instead of surrendering the preferred stock in cancellation of his debt to the petitioner in the amount of $38,073.33, he had himself paid off that debt and yet 400 shares of preferred stock were held by Piper and the petitioner and had not been returned to Edkin. The last paragraph of the claim was as follows: "WHEREFORE, plaintiff claims of the defendants the sum of Twenty-three thousand eight hundred fifty-eight and 47/100 ($23,858.47) dollars, being the balance due for purchase of Forty nine (49) per cent of the common stock of the defendant corporation, and the amount of the loan to the Second National Bank, not paid by the defendant, Erie Bronze Company, and also the sum of Forty-four thousand ($44,000.00) dollars, being the value of four hundred (400) shares of the preferred stock owned by the plaintiff, or in all the sum of Sixtyseven thousand eight hundred fifty-eight and 47/100 ($67,858.47) dollars, together with interest *309 thereon from November 30, 1942, to recover which sums this action is brought." Piper on behalf of himself and the petitioner consulted counsel, who, after some investigation, the extent and nature of which is not shown in the record, advised that there was no merit to the claim but that the agreement of the petitioner to assume the $40,000 debt owned by Edkin to the bank might prove troublesome if the case went to trial. Piper also consulted a financial advisor who suggested that a trial might lead to harmful newspaper notoriety. The attorney and the financial advisor urged Piper to make a settlement with Edkin if he could do so on favorable terms. Edkin and Piper reached an agreement settling their differences under which the petitioner paid Edkin $11,000 in 1946 and, at the same time, cancelled his indebtedness of $8,285.85 to the petitioner. Complete mutual releases were then executed by Edkin, Piper and the petitioner. The petitioner claimed a deduction of $11,000 for "legal and accounting" expenses on its original return for 1946, and filed an amended return claiming $8,285.85 as a deduction for a worthless debt. The Commissioner, in determining the deficiency, disallowed *310 both of the deductions. The stipulation of facts is incorporated herein by this reference. Opinion MURDOCK, Judge: The only contention now made by the petitioner is that the $19,285.85 used in 1946 to reach a settlement with Edkin represents an ordinary and necesary expense incurred during the taxable year 1946 in carrying on its business. It is clear that $11,000 of that amount was actually paid by the petitioner to Edkin and the remaining amount was cancelled as a debt owed by Edkin to the petitioner in 1946 pursuant to their settlement agreement. The petitioner contends that nothing was actually owed Edkin, but the settlement agreement was entered into to avoid unfavorable newspaper notoriety which might result from a lawsuit and also to avoid any difficulty which might arise out of that lawsuit. Edkin based his claim upon the written agreement of November 10, 1932. Piper claims that that agreement was modified by an oral agreement of February 3, 1934. The only evidence of the oral agreement was given by Piper. His testimony on that subject leaves the Court in doubt as to the exact and complete final understanding between Edkin and Piper. Piper testified that Edkin agreed *311 to transfer to him 598 shares of common and 400 shares of preferred stock of the petitioner for $20,000. He was obviously in error as to the number of shares of common because he was never to get more than 499 shares of that stock. Furthermore, it is not at all clear that he was to get 499 shares of common and 400 shares of preferred for $20,000. The written contract did not so provide and other evidence indicates that the complete purchase price for one-half of the preferred and 499 shares of the common was not merely $20,000. The written agreement provided that the petitioner was to pay $40,000 which Edkin owed a bank and was to cancel a debt of $38,073.33 which Edkin owed to the petitioner; Edkin was then permitted to cancel and was expected to cancel all of the preferred shares; and Piper was to pay Edkin $20,000 for 499 common shares. Actually, most of the shares were pledged with the bank and Edkin's indebtedness to the bank had to be paid before Edkin could transfer 499 shares of common to Piper and cancel 800 preferred shares. Piper wanted to acquire a voting interest in the petitioner free from the lien of any indebtedness owed by Edkin. He was willing to pay $20,000 for *312 499 shares of common stock and was willing to have the petitioner cancel the Edkin indebtedness and also pay his indebtedness at the bank provided Edkin would turn in all of the preferred stock for cancellation. That was in November 1932. Piper's management eventually seems to have been successful and it is difficult to understand why Edkin in 1934 would agree to sell Piper one-half of the preferred shares and 499 common shares for $20,000 without provision for someone paying off his debts to the bank and the petitioner. Piper, in his testimony, did not say what was to happen to the $40,000 indebtedness or to the $38,073.33 indebtedness under the oral agreement. It seems only reasonable to believe in the light of all of the evidence that the payment of $40,000 by the petitioner to the bank and perhaps the cancellation of some or all of the indebtedness of Edkin to the petitioner was still tied in with the transfer of the preferred and common shares from Edkin to Piper. Why Edkin waited until Piper owned or controlled all of the stock of the petitioner before making his claim is not clear. However, Piper at that time was in position to cause the petitioner to do as he wished. If Piper *313 was merely having the petitioner pay, either on his or its account, for preferred stock or for preferred and common stock acquired from Edkin, then, of course, the payment would not represent an ordinary and necessary expense incurred in 1946 in carrying on the business of the petitioner. Furthermore, regardless of what the purpose was, the amount would not be deductible in 1946 if the obligation to pay was incurred in a prior year. The record indicates that the petitioner incurred an obligation in 1932 to pay an even larger amount. If it incurred an obligation to pay a larger amount in any prior year, which obligation was settled in 1946 by the payment of a smaller amount, the settlement would not result in a reduction for income tax purposes but, on the contrary, would result in a gain, regardless of whether or not that gain would be recognized for tax purposes. It is impossible to tell from the present record either that the purpose of the payment was not to acquire stock or that the obligation was not incurred in a prior year. The petitioner has failed to show error in the determination of the Commissioner. Decision will be entered for the respondent.